Complainants are residents of Atlantic City, living in homes within the zone of that occupied by the plant of the Atlantic City Electric Company, and seek an injunction *Page 328 
restraining defendant "from maintaining a nuisance on the defendant's property or property adjacent thereto and from operating its said plant or any branch thereof in the manner it is now being operated or in any manner as to constitute a nuisance."
There are several allegations in the bill as to matters and things which complainants aver constitute the various practices of defendant which constitute the nuisances complained of, but it seems to me from the evidence that these allegations are either abandoned or not sufficiently proved, other than as they relate to (a) the alleged nuisance said to result from defendant's maintenance of coal piles adjacent to the plant, and (b) to the alleged nuisances said to result from emissions from some smokestacks in operation at defendant's plant.
I thus eliminate as being not proved the alleged shutting off of Arkansas Avenue by piling heaps of coal thereon; that the neighborhood is zoned as "residential," and I find that it is, in fact, zoned as "commercial" by the 1929 Atlantic City ordinance; alleged reduction of market value of complainants' homes occasioned by the alleged nuisance; obnoxious odors; noises, and injury to health.
Before taking up the question as to whether or not the proof offered by the complainants justify the granting of an injunction against the alleged emission from the smokestacks and the dust and dirt alleged to be escaping from the coal piles, I turn to the nature of defendant's plant and its service to the community.
Defendant's plan in Atlantic City represents an investment of over $8,700,000 and in conjunction with the Atlantic City plant there is another electric generating plant located on the Delaware River at Deepwater, New Jersey, also owned by the defendant company and connected by high tension two-way lines. These two plants supply electricity over the following area, "from Long Beach Island on the north, including all the towns and townships on that island, down the Atlantic coast to Cape May, to South Cape May, up the bay and river to Salem, from Salem to Paulsboro and then down from Paulsboro into Hammonton, Clementon, Egg Harbor, Pleasantville and all towns like Bridgeton, c., in the neighborhood *Page 329 
of that territory, comprising 411 communities with a population of 500,000 people." Over 60% of the electricity generating by these two plants is furnished to war industries within the area aforesaid. The Atlantic City plant is also connected by a two-way circuit with the plant of the Philadelphia Electric Company, so that in cases of emergency Atlantic City may supply the Philadelphia Electric Company with electricity, and vice versa, this inter-connection being intended for the purpose of assuring that the war industries embraced by the area served by the Philadelphia Electric Company may not be interrupted by reason of breakdown or overloading.
The generating power necessary for the operation of the Atlantic City plant is coal, one set of boilers using fine anthracite coal and the other using pulverized bituminous coal.
The Atlantic City plant was established at its present location in 1910. The Deepwater plant was established in 1929 or 1930. Prior to the completion of the Deepwater plant, the plant in Atlantic City was in full operation, but after the completion of Deepwater, until 1940 or 1941 the Atlantic City plant was engaged mainly in supplying steam for the heating of homes and buildings in Atlantic City and was merely an auxiliary station in support of the Deepwater plant. In 1940 or 1941, war demands requiring it, the Atlantic City plant again resumed full operation and from then on has been operating at full capacity at all times.
The evidence clearly shows that experiences over the years demonstrated that if the Atlantic City plant was to operate on coal, as it must, it must create reserves of coal that could be drawn on in case of the stoppage of the output of coal occasioned either by strike or other unforeseen causes. The evidence further clearly discloses that after Pearl Harbor the government issued directives calling attention of the defendant company to the vital necessity for the creation and maintenance of large coal reserves in order that the delivery of power to war industries might not be hampered. Prior to the war the defendant company had created a reserve coal supply in a large coal pile stored on its plant property and called Pile No. 1. After the war started this coal storage *Page 330 
was augmented by the creation of Piles No. 2, 3 and 4, all located on the company's property and in the general vicinity of the homes of complainants. The accumulation of coal in these piles extended to over 55,000 to 60,000 tons and during the period this storage has decreased by about one-half.
Coal Pile No. 1 is located immediately north of the plant on the company's property. This is an active pile but the evidence shows very little complaint with respect to its use since the conveyors were covered. Pile No. 2 is located immediately north of Pile No. 1 and is separated therefrom by Marmora Avenue and an unused right of way of Atlantic City and Suburban Railroad. Pile No. 3 is east of Pile No. 1 and is separated therefrom by the width of Missouri Avenue and enclosed by a wire fence. This pile is now only about eight or ten feet high and is not a source of any grave complaint on the part of any of the complainants. Pile No. 4 is located at the corner of Bacharach Boulevard and Missouri Avenue on lots formerly belonging to the Scranton Coal Company. Piles No. 3 and No. 4 prior to September of 1943 are described by witnesses as being thirty to forty feet high but the evidence shows that these piles in or about September, 1943, were reduced by one-half and that no coal has been taken from these piles since that time with the result that a hard crust has formed over them to the extent that they present a very hard surface over which people may walk without any inconvenience, and I am satisfied that as presently maintained very little if any dust or dirt escapes therefrom.
At the time of the inception of the creation of these reserves of coal I think there may be no question but what the handling thereof permitted the escape of large quantities of coal dust when the coal was piled in a heap and there was nothing to prevent the escape of dust and cinders when the coal was removed from the cars to the heap or from the heap into the plant for consumption. However this may be, the evidence clearly shows that instead of taking the coal from the cars by unenclosed crane and loading it in piles, and instead of taking it by unenclosed crane to the plant for consumption, the handling process now consists of belt conveyors that take the coal from the crane to the coal hopper, being tightly *Page 331 
enclosed with doors, so that in the unloading operation the doors are closed; the coal is then placed on the belt conveyor and transported either into storage or into the station hopper through a system of covered belts. This entire system is covered and was installed about three and a half years ago. The old crane used as aforesaid was known as the "Gantry Crane" and was entirely unprotected. The evidence is that these reserve piles of coal will be eliminated as soon as the emergency which brought them into being is passed.
Prior to July of 1941 I think there may be no doubt but that in the operation of defendant's plant large quantities of white ash, cinders and soot escaped through the smokestack during the operation of defendant's plant and I believe, although it is not necessary to so find, that the volume thus escaping constituted a nuisance which would be enjoined had that nuisance continued unabated. In July of 1941 defendant company started the erection of an additional smokestack and installed new boilers, and in connection therewith what is known as a Cottrell Precipitator, which is an electric apparatus whereby the dust particles are removed physically from the gas stream, there being no mechanical means employed, the operation being strictly an electrical ventilator. The precipitator is solely for the taking out of dust and has nothing to do with gases or the operation of the plant. This system of thus removing dirt or particles from the emissions from the smokestack is the most modern invention known for that purpose and is guaranteed to eliminate 95% of all particles entering into the stack, and the testimony disclosed that in its operation it actually eliminates 97% of these waste materials. This installation was completed in September of 1941 at a cost of $47,000 and has been in operation ever since. Another set of boilers was in operation and still continues so to be with what is known as Green Eliminators, the purpose of the eliminator being to remove the cinders from the gases prior to their entrance into the stack. This, at the time of its installation and prior to 1941, was the best known type of eliminator in existence. However, since 1941 there has been perfected the Cottrell system, which is much superior to the Green system, but the testimony shows that owing to *Page 332 
the impossibility of obtaining priorities on apparatus of this kind, installation up to this time could not be made.
It should be noted that the boilers operating under the Cottrell system aforesaid eliminate all of their vapors through what will be herein called No. 1 stack and that the vapors, c., from the operation of the boilers under the Green system emit all of their residue through what will herein be called No. 2 stack. It should also be noted that there is an evacuator in the stacks, also installed in 1940 or 1941, which is "a piece of apparatus that keeps a seal on the bottom of the stack, letting the cinders that are not entrapped by the different forms of eliminators and that might be carried off into the stack and be deposited, to be carried out and removed hydraulically into the ash disposal system. This evacuator is a bowl filled with water and as the cinders drop into this they are washed continuously into the ash disposal system. The stack is conical in shape and made to a contour to permit all the cinders to gravitate to this evacuator.
The uncontradicted testimony is that the defendant company is operating its plant at the present time, and has been since the beginning of the war, as efficiently as it can be operated under any known system, with the exception of the stoker-fired boilers aforesaid, and that as to these boilers, no improvement has been possible during the war period. It was also testified that the system of storing coal in heaps and the method of its being unloaded from the cars and transmitted to the plant is the best known method of operation and that there is no plant of like character operated with more precaution against escaping dust and dirt.
Many witnesses for the complainants testify seriously and, I believe, conscientiously, that large quantities of fly ash, coal dust and soot escape into the atmosphere within the zone in which their dwellings are located, and that these substances cause them great discomfort and render their homes uncomfortable and cause them great inconvenience. I have no doubt that this is true to some extent, but that the degree of this annoyance is greatly exaggerated is also apparent. These witnesses also testify that these substances of which they complain come from the stack or stacks of the Atlantic City Electric *Page 333 
Company's plant and that they have been coming therefrom as far back as they can remember, and most of them say that there has been no diminution in the volume as they have observed it. I have no doubt that all of this is not true. Certainly the volume of these substances coming from the Atlantic City plant, if they come therefrom, must have diminished after the installation of the Cottrell system and the evacuators, and certainly they must have diminished after the system of handling the coal was changed from the open crane as aforesaid.
Witnesses for the Electric Company say that practically none of these substances of which complainants complain come from their stacks, but that whatever discomfort they get from these substances comes from the stacks of locomotives working in the neighborhood or from the stacks of commercial establishments in the neighborhood, or from the dust from the streets in the neighborhood. These witnesses also testify that there is practically no escape of white ash, cinders or soot from their two stacks. The experts for the defendant admit that black smoke does carry soot and other waste materials.
This court must take notice of conditions which are general and of which all persons must have knowledge. One cannot live in Atlantic City during these war times without realizing that the city authorities do not attempt to enforce their ordinances against the smoke evil and that they do not enforce the provision that anthracite alone shall be burned within the territory of Atlantic City. The casual observer in walking along the street will notice that from all stacks on hotel properties, manufacturing plants, laundries and other commercial establishments, black smoke is emitted and that bituminous coal or oil is the cause thereof. One cannot look over the railroad yards, in close proximity to complainant's residences, without noticing the dense clouds of smoke emitted from the stacks of locomotives as they consume bituminous coal, and by the same token, this court cannot be oblivious to that which it sees daily in the operation of the electric plant. The view from my office desk to the ocean is obstructed by venetian blinds. My observation to the left is through windows which *Page 334 
bring directly into view the two stacks at the Atlantic City Electric Company's plant, and while it may be that the tendency of this case has caused me to look at these stacks more than I otherwise would, my observation has been and continues to be that from stack No. 1 vapors escape. These, however, are invariably light in color and would, according to the testimony of the defendants, contain practically no soot, cinders or other materials of which complainants complain, and I so believe. Stack No. 2, however, at frequent intervals emits a black, dense smoke which I am satisfied from the testimony of the defendant's witnesses carries with it soot, cinders and fly ash, or, if it be true that the combustion of anthracite coal will not produce soot, then it seems to me to be evident that this black substance is oily in its character and its escape into the neighborhood does cause the complainants a great portion of the inconvenience of which they complain.
From what I have said it is quite apparent that at no time since 1941 could defendant have made an installation or improvement in the mechanical operation of the plant which would have further eliminated waste materials escaping through its stack No. 2 in the operation of its stoker-fired boilers, and it further appears that only recently has there been created a device which will reduce in any way the escape of waste materials as it does now escape from stack No. 2. It further appears that the reserves of coal are frequently necessary and the evidence of the annoyance therefrom is not sufficient to require their discontinuance under the circumstances now existing.
Assuming that my conclusions as above indicated are correct, should this court, by its injunctive decree, abate at the present time such nuisance as is created by the emissions from stack No. 2? What would be the effect of such a decree? Under the uncontradicted testimony, the stoker-fired boilers would have to be closed down and the efficiency of the plant for its generation of power reduced by at least one-half. The plant must operate at full capacity to supply the present demands and it could only operate at about one-half capacity under such conditions. Those affected by the elimination of *Page 335 
the stoker-fired boilers would be not only the complainants and other household consumers of electric power, but 60% of the generated power would be denied to those engaged in war industry in the area served by the defendant and the plant closed down to one-half of its capacity would have to so remain possibly until the end of the war.
Complainants, some of whom own their own homes and some of whom are yearly tenants, moved into the neighborhood of the electric plant long after it had been established in its present location and a great many of them had occasion to observe the things of which they now complain before purchasing their homes or becoming tenants in their present locations. They did not file their bill until January 31st, 1944, and did not press to final hearing until January 10th, 1945, at a time when defendant company, by reason of war conditions, is incapable of making a change-over of the mechanical operation of its plant and when ample coal storage for emergencies is absolutely necessary. Under these circumstances, injunctive relief should not be granted at this time. In addition to this, I am advised by counsel for defendant, over the signature of the vice-president and general manager of the Electric Company that work has been started at the plant on the removal of two low-pressure boilers and one 10,000 k.w. turbo-generator, and that in the space made available by these removals there will be installed a 34,000 k.w. turbo-generator unit and one 300,000 pounds per hour boiler operating at approximately 1,400 pounds pressure, along with other related equipment and auxiliaries, the total cost of these new installations being estimated at $3,120,000, and that included in the installation aforesaid are the most modern engineering devices for the removal of fly ash, c., and that also included is another Cottrell Precipitator, the installed cost of which is estimated at $110,000. I am further advised that when the new installations are made as aforesaid the electric plant, together with that in Deepwater, will provide a system of such adequate power facilities that the remaining low-pressure boilers and turbines will be for emergency purposes and operated only during emergency times. Certainly the defendant company cannot be asked by the complainants *Page 336 
to do more than they are attempting to do; and they advise that "work is scheduled for completion in the fall of 1946."
Under the foregoing circumstances, an injunction at this time will be refused, but the bill will not be dismissed and in the event of the failure of the defendant company to carry out its present purpose as aforesaid, application may be made for injunctive relief. This relief, if any, cannot, of course, be asked for while the defendant company is efficiently proceeding with the improvements aforesaid, to the extent that it is possible to carry on under government regulations. *Page 337